May it please the Court, Your Honor, my name is Craig Albert and I'm here for the appellant Vincent Cusano. I'd like to reserve four minutes of my time for rebuttal. Your Honor, this Court's 2001 decision is the touchstone for today's case. Judge Canby and his colleagues already decided everything that is needed to reverse and to remand, this time with tailored instructions to the district court as to how to go about completing this case. The only things that were left to do in 2001 were to conduct limited damages discovery and then to calculate the damages that were due Mr. Cusano for his one-half partial copyright ownership of the LIU compositions. Now, were we to disagree with you on that, that's the end of your case? Pardon me? Let's say we disagree with you on that. Is that the end of your case? That's not the end of the case at all, because in any event, because in any event, there would still have been – there was – if there were an open issue with respect to ownership, there would still have been an issue with respect to whether the royalties that were owed on the undisputed share that Mr. Cusano was still owed, that is, his writer's share, was actually paid. Fair enough. Fair enough. But you're misreading our case. Your Honor, in context, the 2001 decision actually went quite far. How could it? Well, because – How could it conceivably do everything you say? It claims that. Because the issue in 2001 was, after coming out of the bankruptcy in 1990, what was it that Mr. Cusano owned? What were these song rights assets? And the 2001 decision – That's right. Whatever that was, which just can't be – wasn't quite sure what it was, but says whatever it is he went in with, he came out with. And the reason he came out with it is because, after the plan was approved, those rights were averted to your client, either by abandonment or by express – By technical abandonment or by express provision of the plan. Provision of the plan. But you can't – there would have been no occasion to adjudicate whether those rights were – Well, actually – How could that case have done that, even if we had purported to do so? Because the – because Judge Canby wrote that he understood what the song rights meant, what that scheduled asset meant. He said it was copyrights and rights to royalty payments for songs written for the band Kiss pre-petition. So what are those copyrights? So let's say that's what he said. All right. He certainly can't have adjudicated that. It's not a matter that had been adjudicated before. Well, there's no – There's been no proof of it? There's no – there is no dispute that Mr. Cusano's claim to the copyrights in the LIU – Was there anything more than his statement in the schedule that said, I've got these song rights? Was there any proof as to what any of those things consisted of? How could the Court of Appeals possibly have adjudicated what those rights consist of? Your Honor, you need only look not to what Mr. Cusano said, but what counsel for the defendant said. Because when counsel for the defendant went to the – went both to the district court after – in 1999, and later to the bankruptcy court to oppose Mr. Cusano's application to reopen his bankruptcy, both of which were issues that the previous panel of this Court decided, Mr. Wolf said that what Mr. Cusano was asserting and what he had a right to and what he should not be permitted to reclaim was partial copyright ownership. Everyone understood that that was what he had brought in. That was what his – that was what – that was Mr. Cusano's litigation position. That was what Mr. Wolf conceded when he went to the district court. It doesn't matter. People can assume anything they want to, but the case in 1991 can't possibly provide anything more, can't give your client anything more than he walked in at the time. It can't adjudicate. It had no occasion to adjudicate those things. People have a way of referring to these things. They have to refer to them in some way. But you can't pluck state statements out of people's – out of opinions, out of people's statements in court and treat this as an adjudication. The 1990 – I'm sorry, I keep saying 1991. The 2001 case, Cusano won, had no occasion to adjudicate what those rights were. All it said is whatever he walked in with, he walked out with. That's it. And I can't imagine how you are claiming anything else. Your Honor, I – Where was the trial? I mean, these are – there were disputed facts as to what they had. There was a – there was the 84 agreement, which arguably superseded the early agreement. I mean, arguably. That's the position. And the failure of the option under that agreement. And where was that adjudicated? Where was the trial? The failure of the option? Because Mr. Cusano – Well, no, no. You answer my question. We can get to the failure of the option. I'm talking about – I'm talking about the effects of the 1984 – Because Mr. Cusano – 1984 agreement. Right. Where was that adjudicated? Whether that did or did not supersede the – the 82 agreement. It's adjudicating – it's adjudicated in the bankruptcy. Because Mr. Cusano walks into bankruptcy court in 1989 and says – And says, I have – I have certain rights. Right. He says, I have song rights. And he says, there are other people around here who might have – who might be my creditors. And he says who they are. They were Gene Simmons and Paul Stanley. Klein and – Klein and Eisen. He schedules them as creditors. He works his way through the bankruptcy. He submits his plan and he gets his order of – And then – and then – and then he's on challenges. And there are no challenges. He makes his way out. And he takes out, via technical abandonment or express provision of the plan, his song rights. He takes out – It then comes – He takes out what he comes in with. That's exactly right. He can't, in the bankruptcy, claim that he owned the throne of England and come out with the throne of England. Well, except – If – if – if he had going in, he had it coming out. Except for one small fact. And that is – That would be a pretty big fact. Okay. As judge can – as judge can be found, the scheduling of the song right asset and the listing of – of Simmons and Stanley as – as creditors gave them inquiry notice. If there was a question, if somebody said, look, here's a copyright. It's not something that you can touch. It's – it's an intangible. And there are competing claims to it. And if Simmons and Stanley thought that – that Cassano was scheduling, was claiming titles to something, that Simmons and Stanley claimed for them exclusively, that they had an obligation to step forward and say, no, this is ours. When you came out of the bankruptcy, whether by – Why – why did they have that obligation? Sorry? Why did they have that obligation? Your Honor, the – the bankruptcy is not sort of a general place to adjudicate all rights between all the parties. It is a way of allocating assets of the state. And he claims these things are mine. They may have had lots of reasons, including oversight, for not – for not disputing it. But the bankruptcy can't create – can't establish rights that didn't exist prior to bankruptcy. It doesn't resolve the dispute, as though it was a dispute. Aren't you really attempting to turn what was basically a claim into a – the effect of it is some sort of a declaratory judgment action? That's what you're suggesting here. You're suggesting that this would be the same as a declaratory judgment action, and that, in effect, because they didn't jump in, that it's res judicata now, and that they are bound by your client's assertion of his rights. And I think the point made by Judge Kosinski in his, you know, England example, I mean, if I said – if I filed a bankruptcy and I listed as an asset Judge Kosinski's automobile – I should be – have such temerity – you know, if I get through bankruptcy, does that mean that – and if Judge Kosinski, who wasn't, you know, paying attention to my bankruptcy, all of a sudden I can come to his driveway and take his car? You can have it. I mean, I think – But that's really is the question. That may well be – that may well be a concern. But it is a concern. I mean, at that point – But it is a concern that the previous panel, I think, squarely addressed. Well, let's look at it. Show me the opinion. I got the opinion right here. You tell me what is squarely addressed. Okay. Okay? I'm looking right at it. He says – Page? Page. I'm on the – Page. Page. On the – I have the west version. Is that all right? No, it's not. Your Honor, I don't have the slip opinion. Do you have a third side? Yes. Well, that's what we need. Okay. So that's on 940 – on 940 – first the passage on 945, which we've discussed before. That is that he scheduled the Songwrights asset. They reverted to him by technical abandonment and by express provision of the plan. All right. So what it says is? Second. Garbage in, garbage out. Okay. Second, he parses on pages 946 to 947 the carryover paragraph. He says, So what we have to figure out is what are – what do these Songrights mean? And what Song – what – what – What the court is looking at is whether or not during the course of their state the rights that he listed went to somebody else. That's what the court is considering. Well – So it's saying, look, if anybody had doubts about whether they needed to come in and claim that these rights really belong to the state or shouldn't revert to the – to the – to the debtor, they should have been on inquiry notice. I don't – I don't see where this was – But then he – then he says that what the Songrights are are copyrights and rights to royalty payments for songs written for the band Kiss pre-petition. Right. And I think that – I'm sorry. What is this? Copyrights and – he says what Songrights are. And he says that they are – and I'm missing the – the pin site to it right now, which is – oh, I'm sorry. It's in the same paragraph that we were just referring to, the 946 to 947 carryover. The Songrights asset can reasonably interpret it to mean copyrights and rights to royalty payments for songs written for the band Kiss pre-petition. He is talking about two specific groups of assets. He is talking about the copyrights and the streams of royalty payments associated with the LIU compositions and the Creatures compositions. And the 2001 panel had before it the entire record of the proceedings of the Bankruptcy Court. He's looking at – Judge Canby here goes through the proceedings in the Bankruptcy Court. And one of the things that they had looked at was the entry on – was – was what is now – Read the first sentence of the next paragraph. Pardon? Read the first sentence of the next paragraph. Okay. We conclude, therefore – right? So this is – this is what – I'm listing almost, and this is what – We conclude, therefore – Yep. We conclude, therefore, that his listing of the Songrights asset was a sufficient scheduling of Cassano's interest in his pre-petition compositions which reverted to him upon confirmation of the plan. So what reverted to him was his Songrights. And what are those Songrights? His interest, whatever that interest may be. But – His interest may be zero. It may well be, Your Honor, but his – but his – But what you're doing is – You already said that Songrights was copyrights and royalties. But what you're doing is you're – it doesn't make any difference. They're describing what went on. But what you're doing is you're attempting to get preclusive effect to this. You're attempting to suggest here that because they say whatever interest he had, he now has, means he has an interest. And there's – that's a very different thing, as I think Judge Kosinski pointed out. There's a huge difference between saying whatever interest you had, whatever interest you had, you now have, and you have an interest. And because he's just making a claim. In the extreme, Judge Ezra, if that is the case, then the appropriate thing to do would then be to remand so that Judge Mass can determine what it was that Mr. Cassano took into the bankruptcy case, because that is what he would then take out of the bankruptcy case. That's what he did. That's exactly what he did. What you're arguing is that he was wrong because he was bound by the court of appeals' prior determination that he had a specific interest. Okay. Your Honor, I'd also like to – I'd also like to address – pardon? I'd also like to address the issue of the damages discovery and the open book account. Because the primary – I think the primary element of Judge Mass' decision was that Mr. Cassano could not prove up damages. Now, the record is replete with Mr. Cassano requesting and being denied his discovery on the issue of – I thought that the record was replete with instances of your client asking for time to do the discovery and then not doing it. That's what I – that's what I saw the record of being replete with. And sometimes your client saying, I don't need any discovery, and then – and then still asking for more time or being given more time and not doing it. That's what – that's what I saw the record as. Am I misleading the record here? I respectfully disagree. In – after the remand in 2001, what Mr. Cassano's lawyer said was that he did not need any more discovery on the issue of the Creatures of the Night compositions. Those were the ones – claims that were going to be transferred. He did say in his Rule 26 – in his 26F report that they needed to finish up damages discovery. A lawyer of Mr. Cassano's then withdrew. And Mr. – Mr. Cassano then attempted to get other counsel. As soon as he got other counsel, Mr. Benice appeared for him and requested 120 days to complete damages discovery. It's not really any discovery that's needed on the issue of the – issue of the options. Everybody knows what happened. Everybody – and the record of what happened in the bankruptcy court is what it is. No discovery is needed. But ultimately, resolutions need to be made of that. He asked for that discovery. And he did not get that discovery. And the reason that he did not get that discovery on the – at the conclusion of the case was that an associate of Mr. Benice's went to the scheduling conference, and then for some reason, Judge Mass said, well, I don't want to hear from this – hear from this fellow. All discovery is cut off. Plainly, there was discovery that needed to be done on damages, because at a minimum, there was the issue of even Mr. Cassano's writer's share, even if he didn't own the copyrights. How long had discovery been open? Well, discovery had been closed for several – for several years. And each time there was a trip up – a trip up – after the – after there was a trip up to the court of appeals, what – there had been a stay of discovery. And so what the judge said was, when we – in order – in order to have discovery, in order to bring the case to trial, you have to make a motion to reopen discovery. And that's what he asked for. And I think that it's reasonable to ask for the reopening of discovery and allow him that limited discovery. In the extreme, what Mr. Benice then said, look, if you're not going to give me that – if you're not going to give me that discovery, then at least afford me the presumption available under the Wolf v. Superior Court case in California. That casts the burden of proof in what is essentially an accounting case on the defendant to show that they have properly accounted. So having been denied discovery, having been denied the benefit of that presumption – I'm sorry. I'm missing something here. Judge – Judge Matt said you got to move to reopen discovery. Did your client move to reopen discovery? He – I'm sorry. Did he move to reopen discovery? He made the – he made the request in his – in his 26-F statement. They scheduled – they scheduled a joint status conference. The typical practice is that you come to a joint status conference and the judge sets a new discovery deadline, and that gets incorporated in the order. And it was at that session in which Judge Matt said, okay, that's it. The case is over. Okay. When was the motion to reopen discovery filed? There was – there was no formal motion that was ever made to reopen discovery. Thank you, Your Honor. Oh. Thank you. Okay. Thank you. Good morning, Your Honors. Brian Wolfe on behalf of the appellees. Hi, Mr. Wolfe. I'm doing well. Thank you, Your Honor. Anything you've heard this morning that was not adequately covered in your brief? Your Honor, I think that we've addressed all these points in our brief, but I would like to respond just briefly to a couple of the arguments that were made by counsel. So I guess you think it was not adequately covered in your brief. Go ahead. Your Honor, I – I – I – there's – there's only a couple of points that were newly raised that I think are appropriate to respond to. Very briefly, and that is, number one, with respect to the argument that either this Court previously in its 2001 decision or the bankruptcy court in its 1990 plan of reorganization somehow abrogated or voided the governing agreements between the parties, between Cusano and Kiss, that finds no support in the record whatsoever. That point was not in your brief? It was in the brief, Your Honor. Or you – or you think we don't understand it? Well – Were you present during? No, Your Honor. Okay. Well, go – go ahead. Keep talking. My talk has got a lot of time. With that advice, then I'll – I'll rest on my papers, Your Honor. I mean, were you present for this? Yes, I was, Your Honor. This brief? Yes. Thank you. Okay. Thank you. The occasion, sorry, it was past a minute.
judges: Canby, Kozinski, Rawlinson